Filed 6/18/15  Charter Adjustments v. Tung CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CHARTER ADJUSTMENTS CORPORATION,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>STEPHEN S. TUNG,<br><br>        Defendant and Appellant. | A140117<br><br>(Alameda County<br> Super. Ct. No. HG08424042) |

This is an appeal from judgment following a bench trial.  Plaintiff Charter Adjustments Corporation (Charter) sued defendant Stephen S. Tung for breach of contract after he failed to pay the outstanding balance due for the dry cleaning waste recycling services provided by Pacific Resource Recovery (Pacific) to Resolvent, Inc., a Nevada corporation for which Tung served as President.  Resolvent's debt to Pacific had been duly assigned to Charter for collection.  The trial court found that, pursuant to a November 2007 contract, Tung assumed personal liability for payment of all balances due Pacific in the event Resolvent failed to make a payment.  On appeal, Tung denies having personally guaranteed payment of Resolvent's debt under this contract and, alternatively, contends that the contract should not be enforced against him as it is unconscionable.  We affirm the trial court's judgment for reasons stated below.

1

## FACTUAL AND PROCEDURAL BACKGROUND

Pacific agreed to provide Resolvent the service of dry cleaning waste removal and recycling. To that end, in November 2007, Resolvent executed an "Application and Agreement for Credit" (hereinafter, the contract). The contract was completed and signed on behalf of Resolvent by its corporate president, Tung, and corporate secretary, Mark Ng.[1] Tung then faxed this document to Pacific on or about November 8, 2007. Among other things, the contract provided: "The above information is for the purpose of obtaining credit and is warranted to be true. I (we) agree to pay all amounts due upon receipt of statement of account or as otherwise expressly agreed. If the corporation fails to make payment I (we) guarantee to pay all balances due the seller."[2]

As of August 2008, Pacific had sent Resolvent eight invoices seeking payment for its services that remained unsettled. In October 2008, Pacific duly assigned this debt to Charter for collection. Charter then filed this lawsuit against Tung, et al., on December 8, 2008 to recover the unpaid balance due on the account after its collection efforts proved unsuccessful.

At a subsequent bench trial, Charter established that Resolvent, by then a defunct company, had an unpaid balance on its Pacific account totaling $64,801.93. And despite Charter's efforts to collect this debt from Resolvent, Tung and Ng, the debt had not been paid.

Tung, in turn, acknowledged in testimony that he signed the contract on behalf of Resolvent, and that he read the entire document, which was faxed to him, before doing so. Tung insisted, nonetheless, that he did not intend upon signing the contract to bind anyone other than Resolvent to its terms. More specifically, Tung denied having any

---

[1]    Plaintiff dismissed claims against Ng on April 25, 2012.

[2]    The one-page contract consisted of a fill-in-the-blank application form requiring identification of the credit applicant, its trade references and a bank reference; a two-paragraph section setting forth the "SALES TERMS AND CONDITIONS"; and a section for the applicant's name, signature and execution date.

intent to assume personal liability for any balance owed but not paid by Resolvent. Tung left Resolvent in August 2008.

At the conclusion of trial, the court rejected Tung's arguments that the contract did not contain a valid personal guaranty provision and was ambiguous as to whether he assumed personal responsibility for payment of Resolvent's unpaid account with Pacific. The trial court then entered judgment in favor of Charter and against Tung in the amount of $64,801.93, plus $385.00 in costs and $31,531.02 in prejudgment interest, for a total of $96,717.95. This timely appeal followed.

## DISCUSSION

Tung raises the following arguments on appeal, which we address in turn below. First, Tung contends there is no valid contract between Pacific and Tung, the individual, because: (a) he was not party to the contract between Pacific and Resolvent; (b) there is no objective, unambiguous manifestation of his intent to personally guarantee payment to Pacific for the services it provided to Resolvent; and (c) no consideration passed directly from Pacific to Tung. Second, Tung contends that he owes no money to Charter under the contract because, as of the time of trial, there was no balance lawfully due from Resolvent on its Pacific account given that all of Resolvent's debts had been liquidated through bankruptcy. Third, Tung contends the trial court should have refused to enforce the contract against him under the doctrine of unilateral mistake. And, lastly, Tung contends the contract is not enforceable against him because the term by which he personally agreed to guarantee payment is unconscionable.

"We independently interpret a written contract when no extrinsic evidence and related credibility questions were presented below." (*Culligan v. State Comp. Ins. Fund* (2000) 81 Cal.App.4th 429, 434.) " 'The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. (Civ. Code, § 1636.)' [Citation.] 'Such intent is to be inferred, if possible, solely from the written provisions of the contract.' [Citation.] 'If contractual language is clear and explicit, it governs. (Civ. Code, § 1638.)' [Citation.]" (*La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co.* (1994) 9 Cal.4th 27, 37.) Further, to the extent the appellant challenges the trial court's

3

express or implied factual findings, we examine the record for substantial evidence to support those findings. (*Nordquist v. McGraw-Hill Broadcasting Co.* (1995) 32 Cal.App.4th 555, 561.) The testimony of a single credible witness may constitute substantial evidence. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614.)

## I.     Is there a valid contract between the parties?

According to Tung, he cannot be held personally liable for Resolvent's debt because he is not a party to the contract, did not manifest his intent to personally guarantee this debt, and received no consideration from Pacific for doing so. We disagree in all regards.

With respect to Tung's denial of being a party to this contract, he reasons that a personal guarantee is a separate contract that must "stand apart" from the primary contract. Here, Tung signed the contract only once – he says, in his capacity as President of Resolvent on behalf of Resolvent. Thus, Tung insists, because he did not sign the contract a second time in his individual capacity, he is not party to the contract.

California contract law, however, is quite clear that a personal guaranty need not take any particular form. Rather, "[a]s long as the agreement establishe[s] the intention of creating a contract of guaranty, no set words and form [a]re required." (*Ingalls v. Bell* (1941) 43 Cal.App.2d 356, 366.) Moreover, California law also provides that a " 'director, officer or other agent, signing a corporate contract containing a promise in the proper form for an individual, is not relieved from personal liability by the addition to his name of terms such as "director," "president" or the like. These terms are regarded merely as *descriptio personae*, that is, a term descriptive of the person rather than the relationship in which he signs the agreement. [Citation.]' [Citations.] [¶] ' "... Where a writing in the nature of a contract is signed by a person, and contains apt words to bind him personally, the fact that to such signature is added such words as 'trustee,' 'agent,' 'treasurer,' 'president,' and the like does not change the character of the person so signing, but is considered as merely descriptive of him. ... The mere fact that a person sustains an agency relation to another does not prevent him from becoming personally liable on a contract with a third person, and, if it appears from the contract that he

4

pledged his own credit or bound himself personally, the addition of such words as 'president' and the like will be considered as mere descriptio personae. . . ." ' [Citations.]" (*Sebastian Int'l v. Peck* (1987) 195 Cal.App.3d 803, 808 [affirming a finding that the defendant was personally liable on a lease guaranty where the terms of the guaranty referred to the defendant in his individual capacity, but the signature line identified him as "[defendant], Vice President"].)

Accordingly, we must look to the contract language as a whole to determine whether Tung personally assumed liability for payment of Resolvent's debt to Pacific rather than simply the title attached to his signature. Having done so, we conclude Tung did in fact assume personal liability.

Indeed, by its terms, the contract expressly identifies a personal obligation to be undertaken by Tung: "If the corporation fails to make payment*, I (we) guarantee to pay all balances due the seller*." (Italics added.) The mere inclusion in the signature line of the word "President" in no way alters this personal obligation, triggered by the corporation's (Resolvent's) "fail[ure] to make payment." Rather, the word, "President," is merely descriptive of Tung's position with Resolvent. Accordingly, under the authority set forth above, Tung may be held personally liable for his contractual obligation. (See *Sebastian Int'l v. Peck, supra,* 195 Cal.App.3d at p. 808.) While Tung is correct that an individual may act as a corporate agent without assuming personal liability for an act or omission of the corporation, this fact does not mean that an individual serving in the capacity of corporate agent may never assume personal liability for a corporate act or omission. Indeed, Tung did so here by entering into a contract that unambiguously sets forth his personal guaranty of Resolvent's debt, notwithstanding the reference to his corporate title in the signature line.

Next, with respect to Tung's contention that he did not manifest his intent to personally guarantee Resolvent's debt to Pacific, we again conclude the contract language clearly establishes otherwise.

Tung correctly notes that, under well-established principles of contract law, "[a]n essential element of any contract is 'consent.' (Civ. Code, § 1550; 1 Witkin, Summary of

5

Cal. Law (9th ed. 1987) Contracts, § 6, p. 44.)" (*Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 811 (*Weddington*).) Moreover, this " 'consent' must be 'mutual.' (Civ. Code, § 1565; 1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 119, p. 144 ['Every contract requires mutual assent or consent']; [citations].) 'Consent is not mutual, unless the parties all agree upon the same thing in the same sense.' (Civ. Code, § 1580; see also Civ. Code, § 1636 [contracts must be enforced according to the 'mutual intention of the parties as it existed at the time of contracting'].)" (*Weddington, supra,* 60 Cal.App.4th at p. 811.) However, " 'The existence of mutual consent is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe.' [Citation.] Outward manifestations thus govern the finding of mutual consent required by Civil Code sections 1550, 1565 and 1580 for contract formation. (See also 1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 119, p. 144 ['. . . the outward manifestation or expression of assent is controlling. Mutual assent is gathered from the reasonable meaning of the words and acts of the parties, and not from their unexpressed intentions or understanding'].)" (*Weddington, supra,* 60 Cal.App.4th at p. 811.)

Here, regardless of what Tung privately understood, objectively viewed, he agreed, upon signing the contract, to assume personal liability for any unpaid balances owed by Resolvent to Pacific. Tung's consent in this regard is in clear and unambiguous contract language. And, as the California Supreme Court has often stated, where "contractual language is clear and explicit, it governs." (*La Jolla Beach & Tennis Club, Inc., supra,* 9 Cal.4th at p. 37.) The party's interpretation of it does not.

And, finally, we turn to Tung's contention that Charter cannot enforce the contract against him because Pacific paid him no consideration under the contract. The law, again, is otherwise. "Where, as here, the guaranty and principal obligation form one instrument and are entered into at the same time, consideration for the principal obligation also forms consideration for the guaranty. ([citation]; 59 Cal.Jur.3d, *supra,* § 19, p. 41; 38 Am.Jur.2d, *supra,* §§ 44-45, pp. 1047-1048.) That no consideration flowed directly to the guarantor is irrelevant and it is no defense to the guarantor.

6

([citations]; 10 Cal.Jur.3d, *supra*, § 93, p. 108; 11 Am.Jur.2s, Bills and Notes, § 217, p. 245.) Neither does it matter from whom the consideration flowed. (*Ibid*.)" (*Niederer v. Ferreira* (1987) 189 Cal.App.3d 1485, 1504.)

In this case, Tung does not dispute that Pacific provided consideration to Resolvent under the contract. Having done so, there was no need for Pacific to provide separate or additional consideration for Tung's personal guaranty, which was part of, and executed simultaneously with, the contract. (*Niederer v. Ferreira, supra,* 189 Cal.App.3d at p. 1504) The fact that no consideration flowed directly from Pacific to Tung, the individual, is of no moment. Under the law set forth above, such fact does not preclude a finding by the court that valid consideration supports Tung's personal guaranty of Resolvent's debts to Pacific. (See also *Rancho Santa Fe Pharmacy, Inc. v. Seyfert* (1990) 219 Cal.App.3d 875, 878-879 ["where a promissory note is given for consideration, a later guaranty of that note lacks consideration and cannot be enforced. [Citation.] When, however, the guaranty is made coincidentally with the promissory note, the guaranty is supported by the same consideration as the note and is enforceable. [Citation.]"]; *Dan Ryan Builders, Inc. v. Nelson* (W. Va. 2012) 737 S.E.2d 550, 557-558 ["formation of a contract with multiple clauses only requires consideration for the entire contract, and not for each individual clause. [Fn. omitted.] So long as the overall contract is supported by sufficient consideration, there is no requirement of consideration for each promise within the contract, or of 'mutuality of obligation,' in order for a contract to be formed"]; *Hall v. Small* (Mich. 2005) 705 N.W.2d 741, 743-744 [same].)

## II.    Is There A Balance Due To Be Paid By Tung To Charter Under The Contract?

Tung contends there was an unsatisfied condition precedent to his personal guarantee to Pacific – to wit, the existence of a balance lawfully owed by Resolvent on the Pacific account when this case went to trial. As Tung notes, as a result of Resolvent's bankruptcy proceedings, all of its corporate debt was liquidated prior to trial. Tung thus reasons: "If there were no balances lawfully due to [Pacific], then this action must fail, as the condition precedent to Tung's obligation to pay – the existence of balances due and payable – is not satisfied." We disagree.

"The Bankruptcy Code provides that a discharge of a debtor '(1) voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged . . .; [¶] [and] (2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt *as a personal liability of the debtor . . . .*' ([Bankruptcy Code, 11 U.S.C.S.] § 524(a), italics added.) However, the 'discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.' (*Id.*, subd. (e).) [¶] "Together, the language of these sections reveals that Congress sought to free the debtor of his personal obligations *while ensuring that no one else reaps a similar benefit.*' (*Green v. Welsh* (2d Cir. 1992) 956 F.2d 30, 33.) Thus, it is clear that, following discharge, a plaintiff or other creditor may not seek to hold the debtor personally liable for any debt, but may proceed *against either a codebtor or a surety or guarantor who guaranteed the debtor's payment of that debt.* (*Id.*, p. 33, fn. 1.)" (*Forsyth v. Jones* (1997) 57 Cal.App.4th 776, 780-781 [italics added].)

In *Forsyth v. Jones*, the reviewing court held that section 524, subdivision (a) of the Bankruptcy Code does not enjoin an action against a discharged debtor when pursued solely to recover from the debtor's insurer. In so holding, the court explained as follows: "[T]he purpose of bankruptcy in general, and of the discharge and permanent injunction in particular, is to give the debtor the opportunity to make a fresh start financially. [Citation].) It is not to deprive a claimant unnecessarily of the means to recover damages for a potentially meritorious claim." (*Forsyth v. Jones, supra*, 57 Cal.App.4th at pp. 781-782.) Likewise here, the fact of Resolvent's status as a discharged debtor does not preclude Charter from seeking to recover the balance owed on Resolvent's account from Tung, the individual who independently assumed liability for payment of the balance.

Moreover, we also reject Tung's related contention that Charter is barred from holding him personally liable under the guaranty for Resolvent's debt absent evidence that Charter filed a proper creditor claim against Resolvent in the bankruptcy

8

proceedings. "[A]fter a default by the principal, . . . the creditor may pursue an independent action against the surety without the need of any prior collection effort, by suit or otherwise, against the principal." (*Impac Imported Parts & Accessories Corp. v. Rattray* (1979) 95 Cal.App.3d 792, 796-797, citing *Ingalls v. Bell, supra,* 43 Cal.App.2d at p. 367.)

### III. Is The Provision By Which Tung Personally Guaranteed Payment Unconscionable?

Tung also contends the court should deny enforcement of the contract because it is both procedurally and substantively unconscionable. The law is as follows.

An unconscionable contract or provision may be subject to revocation under general contract principles. (*Szetela v. Discover Bank* (2002) 97 Cal.App.4th 1094, 1099; *Baker v. Osborne Development Corp.* (2008) 159 Cal.App.4th 884, 894; Civ. Code, § 1670.5, subd. (a).)[3] More specifically, a contract or provision that is both procedurally and substantively unconscionable is unenforceable. A procedurally unconscionable provision is one based upon "oppression" or "surprise," often due to the contracting parties' unequal bargaining power. A substantively unconscionable provision is one that is "overly harsh" or unfairly "one-sided," in other words, lacking "a modicum of bilaterality." (*Armendariz v. Foundation Health Psychecare Services, Inc.* (2000) 24 Cal.4th 83, 114, 119 (*Armendariz*).)

" 'The prevailing view is that [procedural and substantive unconscionability] must *both* be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability.' [Citation.] But they need not be present in the same degree. 'Essentially a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms

---

[3] Under Civil Code section 1670.5, subdivision (a), "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result."

themselves.' [Citations.] In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." (*Armendariz, supra,* 24 Cal.4th at pp. 114, 119. See also *Harper v. Ultimo* (2003) 113 Cal.App.4th 1402, 1406-1407 ["There is a sliding scale where the greater the evidence of procedural unconscionability, the less evidence is needed of substantive unconscionability"].)

Where, as here, the trial court's unconscionability ruling is based on undisputed facts, we review the ruling de novo. (*Flores v. Transamerica HomeFirst, Inc.* (2001) 93 Cal.App.4th 846, 851; *Brookwood v. Bank of America* (1996) 45 Cal.App.4th 1667, 1670.) We keep in mind, however, that the party opposing enforcement of the contract provision has the burden of proving unconscionability. (*Szetela, supra*, 97 Cal.App.4th at p. 1099.) Moreover, consistent with basic contract law, "[i]f it may be done without violating the parties' intent, we must interpret the contract in such a way as to make it lawful, operative, definite, reasonable, and capable of being carried into effect." (*24 Hour Fitness, Inc. v. Superior Court* (1998) 66 Cal.App.4th 1199, 1214-1215.)

Tung identifies the following factors that he insists rendered the personal guaranty provision of the contract unconscionable: (1) the personal guaranty language was "buried in fine print" in a preprinted, standardized contract; (2) Pacific failed to mention or point out this language when offering the contract to him for signature; (3) he had no opportunity to negotiate the provision; (4) the provision was outside the scope of his reasonable expectations when signing the contract; and (5) the legibility of the contract received by him via facsimile is "unknown". More generally, Tung describes the contract as one of adhesion, "i.e., a standardized contract drafted by the stronger party and presented to the weaker party on a take-it-or-leave-it basis." (*Murphy v. Check 'N Go of California, Inc.* (2007) 156 Cal.App.4th 138, 144; see also *Armendariz, supra*, 24 Cal.4th at p. 113.) We again disagree.

First, as explained at length above, the personal guaranty provision is stated in clear and unambiguous language. While Tung describes the provision as written in fine print in a preprinted, standardized agreement, without a topic-specific heading to draw

the reader's attention to it, the record undermines any suggestion that the relevant language came as an unfair surprise. As Charter points out, the contract, while standardized and in a preprinted form, is on a single page with only two short paragraphs setting forth the terms and conditions of sale. Indeed, the personal guaranty provision itself consists of just one sentence of clear and concise language. (P. 2, *ante*.) And, while Tung claims that no evidence proved the contract, which was faxed to him, was legible when he signed it, the contract language, which he admits having read before signing the document, is not in dispute.

Nor does the record support Tung's claim that the contract was presented to him on a take-it-or-leave-it basis by a party with superior bargaining power, thereby denying him a meaningful opportunity to negotiate its terms. Rather, Tung signed the contract as Resolvent's President, a position of seniority he held for five years, indicating an above-average amount of experience in the business world. No evidence has been presented to the contrary. In addition, as Charter notes, Tung had the one-page contract in his possession for about six days before he returned the executed copy to Pacific via facsimile. There is no evidence that, during these six days, Pacific in any way pressured or compelled Tung to execute it. As such, we are at a loss to understand how this contract could be deemed anything but fair and bilateral. (Cf. *Martinez v. Master Protection Corp.* (2004) 118 Cal.App.4th 107, 114 ["[a]n arbitration agreement that is an essential part of a 'take it or leave it' employment condition, without more, is procedurally unconscionable"]; *Armendariz, supra*, 24 Cal.4th at p. 115.)

Finally, while Tung insists that he "plainly did not understand that the agreement for credit exposed him to personal liability for the debts of Resolvent," as we have already explained, Tung's personal understanding with respect to this contract is beside the point. (*Weddington, supra,* 60 Cal.App.4th at p. 811.) Simply put, there is no evidence to support a finding that the personal guaranty provision exceeded Tung's reasonable expectations under the given circumstances. As several California courts have explained, when determining whether a contract is unconscionable, the contract must be analyzed "as of the time [it] was made." (*A & M Produce Co. v. FMC Corp.* (1982) 135

11

Cal.App.3d 473, 487. See also *American Software Inc. v. Ali* (1996) 46 Cal.App.4th 1386, 1391 ["[t]he critical juncture for determining whether a contract is unconscionable is the moment when it is entered into by both parties ─ not whether it is unconscionable in light of subsequent events"]; Civ. Code, § 1670.5, subd. (a).)  Thus, while Resolvent's bankruptcy may be unfortunate for Tung, it provides no basis for excusing him from the personal obligation he undertook upon signing this contract.

Thus, for the reasons provided, we conclude the doctrine of unconscionability does not excuse enforcement of this contract.

## IV.  Is Enforcement Of The Contract Barred By The Doctrine Of Unilateral Mistake?

Finally, Tung contends that, assuming validity of the contract's personal guaranty provision, it nonetheless should not be enforced pursuant to the doctrine of unilateral mistake.  However, as Tung recognized, the doctrine of unilateral mistake operates to bar enforcement of a contract only where, inter alia, the contract contains a material, unilateral mistake by a party such that enforcement of the contract would provide the other party with an unconscionable advantage.  (See *Donovan v. RRL Corp*. (2001) 26 Cal.4th 261, 281 ["Because the rule in section 153, subdivision (a), of the Restatement Second of Contracts, authorizing rescission for unilateral mistake of fact where enforcement would be unconscionable, is consistent with our previous decisions, we adopt the rule as California law"].)  Tung's argument in this regard thus hinges on his previously-rejected argument that holding him personally liable under the contract for Resolvent's debt would be unconscionable.  Because we have already concluded otherwise, his unilateral mistake argument also fails.

### DISPOSITION

The judgment is affirmed.  Costs on appeal are awarded to Charter.

_____
Jenkins, J.

12

We concur:

_____
McGuiness, P. J.


_____
Siggins, J.